CHICAGO AND NORTH WESTERN RAILWAY COMPANY, appellee, v. IOWA STATE TAX COMMISSION et al., appellants.

No. 51600.

(Reported in 137 N.W.2d 246)

1360

SEPTEMBER 21, 1965.

Lawrence P. Scalise, Attorney General, and George W. Murray, both of Des Moines, for appellant Iowa State Tax Commission.

Marion Hirschburg and Donald L. Smith, both of Ames, for appellants county treasurers.

Davis, Huebner, Johnson & Burt, Frank W. Davis and Frank W. Davis, Jr., all of Des Moines, for appellee.

LARSON, J.—Pursuant to the action of the Iowa State Tax Commission, hereinafter referred to as the commission, in fixing the assessed value of the property of the Chicago and North Western Railway Company, hereinafter referred to as the North

Western, for the year 1963, the North Western filed an original petition and first amendment thereto in the Polk County District Court seeking (1) a judgment declaring null and void that assessment and (2) a writ of mandamus commanding the defendant commission to equalize such assessed value of the North Western with the assessed value of other railway companies subject to chapter 434, Code of Iowa, 1962, and with the assessed value of other properties subject to taxation in the state.

It was alleged the commission acted in an arbitrary, capricious, illegal and fraudulent manner (1) in fixing the North Western's property value for tax purposes in excess of its "actual value" as defined in the Code, (2) in assessing the North Western property at a higher percentage of its actual value than the property of other railroads in Iowa, and (3) in assessing the North Western property at a higher percentage of its actual value than was done generally with other property subject to taxation in Iowa. The commission filed a denial of the allegations and alleged plaintiff had failed to exhaust its administrative remedies. Plaintiff's prayer for auxiliary remedy by way of a temporary injunction restraining county auditors and county treasurers from collecting the 1963 taxes so assessed by the commission was denied and the action dismissed as to them. Thereafter, the cause was tried in equity on March 23, 1964, and on August 5, 1964, the trial court entered its findings of fact, conclusions of law and decree.

The court found plaintiff had exhausted all administrative remedies, had no plain or adequate remedy at law, was entitled to maintain this action and have a determination of the issues on the evidence presented (Pierce v. Green, 229 Iowa 22, 294 N.W. 237, 131 A. L. R. 335), concluded its province in this cause was to pass on the validity of the commission's exercise of discretion and not to fix the value of plaintiff's property, and that it could only require the commission to perform its legal duty, found the term "actual value" as used in the Iowa statutes on taxation must be the "fair cash equivalent of the property", and held the evidence failed to establish that the commission acted in an arbitrary manner in fixing the 1963 valuation of the North Western property. It further held the evidence sufficient to prove the

commission had assessed the North Western property at a higher percentage of its actual value than other comparable railroads in Iowa, and did so arbitrarily, and that while the North Western property was assessed at 60 percent of its actual value, other property in Iowa was generally assessed at less than 30 percent of its actual value, and that this discrimination was willfully done in an arbitrary and capricious manner. A reassessment was ordered. The defendants appealed.

On September 28, 1964, this court, on application of plaintiff-appellee, entered an order making the county treasurers of 55 Iowa counties in which the North Western has operating property parties to this action, and enjoining them from collecting the second half of the 1963 taxes, collectible in 1964, pending final determination of the case.

The issues raised by this appeal concern the correctness of the trial court's conclusions of law that (1) "actual value" as used in the statutes on taxation in the Code must be the "fair cash equivalent of the property" (2) the commission assessed the property of the North Western at a higher percentage of its actual value than the property of the four other major railroads in Iowa and, in doing so, acted in an arbitrary and capricious manner (3) the commission assessed the property of the North Western at 60 percent of its actual value when other property in Iowa was generally assessed at less than 30 percent of its actual value, and, in so doing, acted in an arbitrary and capricious manner, and also concern its findings of fact in support of those conclusions.

By stipulation, records and documents including Steam Reports, Form A.I.C.C. Reports, Annual Stockholders' Reports, assessment rolls, and data sheets (Exhibits PT 1–15), for the North Western, Milwaukee, Burlington, Rock Island and Illinois Central Railroads for the years 1960, 1961 and 1962, subject to their materiality and competency, were usable without formal identification, as well as records in all recorder and assessor offices and proceedings in local boards of review and the State Board of Review, and data relating to a Real-estate Assessment Ratio Study and instructions to assessors for reports made under

Code section 441.45 for 1961 and 1962. These and other included exhibits are now before us.

Data sheets used by the commission in assessing the North Western in 1960, 1961, 1962 and 1963 were identified by Mr. Provo, vice president of finance for the plaintiff. They reveal a generally approved three-factor formula used in Iowa as well as in most states over many past years, for determining a formula value for railroads operating in more than one state. Exhibit P-22 disclosed these calculations for the North Western for the year 1963. The first factor is average annual net operating income of the railroad system for the preceding five years, capitalized at six percent. A portion of total capitalized income is then attributed to the value of operating property in Iowa by an allocation formula based on the extent of the railway's operation in Iowa—in this case, 20.983 percent. The second factor is the average net stock and bond value of the entire system for the preceding five years, with the portion attributable to Iowa determined by application of the above stated allocation formula. The third factor is the reproduction cost of operating property actually situated in Iowa, less depreciation, less a uniform 40 percent deduction for obsolescence, also allocated. These three factors are averaged together and result in the so-called "formula value" of the North Western system in Iowa of $29,-493,221. To this figure is applied a judgment factor by the taxing authority after an overall consideration of the railroad's Iowa operation, and the result here, $27,516,361, is taken as the actual value of the property which is then assessed at 60 percent to obtain the assessed value under provisions of section 434.15, Code of Iowa, 1962. Also to be considered is section 441.21 of the 1962 Code, which provides that all property subject to taxation shall be valued at its actual value and shall be assessed at 60 percent of such actual value, and that the actual value in such cases shall be one and two thirds times the assessed value.

Under this record there are five major or Class I railroads operating in Iowa. In compliance with the requirements of Code chapter 434, each on or before April 1 filed with the commission annual reports on forms furnished by the commission, and from this and other data available to it the commission's employees

prepare a tentative formula value and work out the proposed 60 percent assessed value therefrom. The railroad affected is notified of this proposed value and a hearing is granted, if desired, sometime in the following June, affording the railroad an opportunity to point out elements not given adequate consideration in the computations. This hearing is before the commission, which also has before it the work sheets, the data and the proposed assessment. Generally, this was done. Thereafter, the commission proceeds to fix the final assessment. There are no provisions for a further hearing before the commission thereon, but they are sometimes granted, as was done in this case for the North Western, after the assessment had been certified to the various counties. However, no change in its assessment was made. The trial court found the system used in Iowa was proper and, as the record fully justifies that conclusion, we concur in that determination.

Exhibit P-47 shows the ratio of the 1963 assessed values of the five Class I railroads determined by the commission to the formula values, after application of the required 60 percent, as follows:

| Railroad | Assessment by formula only | Assessment determined by commission | Ratio |
|----------|---------------------------|-------------------------------------|-------|
| C. & N.W. | $17,013,089 | $16,510,417 | 97% |
| C. R. I. & P. | 26,886,823 | 19,171,306 | 71% |
| C. B. & Q. | 26,577,493 | 17,952,953 | 68% |
| I. C. | 12,158,019 | 8,146,043 | 67% |
| Milwaukee | 31,582,061 | 20,186,196 | 64% |

The North Western points out that for 1963 and prior years only a slight deviation from the formula value appears as to it, while for all other Class I railroads, which it contends have like equipment and like operations in Iowa, substantial reductions from the commission's formula values appear. It appears the North Western's assessed value was reduced only three percent by the application of the commission's judgment factor, while the other alleged comparable railroads showed a 29 to 36 percent reduction for 1963.

There was considerable evidence that the North Western stands in a position inferior to the other four Class I railroads,

that its mileage was due largely to numerous branch lines with low density of traffic and short average haul. Logically, appellee contends that this results in low net operating income, increased maintenance costs, large depreciation factors, as well as greater obsolescence, and that while some of these factors may be considered in the formula value, they could not reasonably result in raising the overall value of the system via a judgment factor.

Apparently no 40 percent obsolescence allowance was made the North Western in 1960 and, while this may well have been an oversight, it is noteworthy that, while other roads received substantial reductions in formula values each year, the North Western values remain about the same. Although the North Western acquired the property of the M. & St. L. Road in 1960, it is not contended subsequent reports did not properly reflect that addition. There is a suggestion this acquisition did enter into the commission's judgment factor, but no member of the commission so testified nor attempted to justify such consideration.

I. North Western has alleged that the assessment of its property is in violation of the United States Constitution, Amendment 14, section 1, and of the Iowa Constitution, Article I, section 6, Article III, section 30, and Article VIII, section 2. There is no claim the applicable taxation statutes are unconstitutional, but it is claimed those statutes have not been followed by the assessing authorities.

The trial court carefully reviewed these factors and concluded: "The uncontroverted evidence of the plaintiff clearly establishes that the North Western is in an unfavorable economic position in comparison with the other four railroads, and establishes that there are no economic factors in existence which might justify the variation in the departures from formulaic values between the five railroads." Space will not permit a detailed review of this evidence, but we concur in the finding of a lack of justification for such a large variation in the final values among these railroads. The trial court set out the pertinent facts revealed by the evidence over the past five years, together with computations of the deviations of the final assessments from the formula values, as follows:

| | Track Miles | 60% Value by Formula | 60% Value by Tax Commission | Reduction or Increase From Formula Value | Ratio of Final Assessed Value to 60% Formula Value-% |
|---|---|---|---|---|---|
| 1959 ASSESSMENT | | | | | |
| Northwestern | 1333 | 17,530,638 | 17,379,644 (D-4) | 150,994 | 99 |
| M. & St. L. | 655 | 8,584,645 | 4,376,609 (D-4) | 4,208,036 | 51 |
| 1960 ASSESSMENT | | | | | |
| Northwestern | 1333 | 21,669,501 (a) | 16,511,014 (D-3) | 5,158,487 | 76.2 |
| Northwestern | 1333 | 16,295,222 (b) | 16,511,014 (D-3) | (215,792) (c) | 01.6 |
| M. & St. L. | 655 | 8,570,408 | 4,595,636 (D-3) | 3,974,772 | 53.6 |
| Burlington | 931 | 27,886,664 | 20,514,000 (D-3) | 7,372,664 | 73.6 |
| Milwaukee | 1710 | 33,950,180 | 21,890,747 (D-3) | 12,059,433 | 64.5 |
| Rock Island | 1939 | 33,424,603 | 22,132,205 (D-3) | 11,292,398 | 66.2 |
| I. C. | 687 | 14,983,167 | 9,020,136 (D-3) | 5,963,031 | 60.2 |

### 1961 ASSESSMENT

| | | | | | |
|---|---|---|---|---|---|
| Northwestern | 1989 | 17,786,007 | 16,510,951 (P-32) | 1,275,056 | 92.8 |
| Burlington | 926 | 27,211,755 | 19,283,547 " | 7,928,208 | 70.9 |
| Milwaukee | 1709 | 33,772,888 | 21,234,875 " | 12,538,013 | 62.9 |
| Rock Island | 1939 | 30,060,802 | 20,804,920 " | 9,255,882 | 69.2 |
| I. C. | 687 | 13,763,378 | 8,749,785 " | 5,013,593 | 63.6 |

### 1962 ASSESSMENT

| | | | | | |
|---|---|---|---|---|---|
| Northwestern | 1988 | 19,503,283 | 16,511,168 (P-33) | 2,992,115 | 84.6 |
| Burlington | 879 | 26,443,088 | 18,319,635 " | 8,123,453 | 69.3 |
| Milwaukee | 1709 | 33,739,575 | 20,598,524 " | 13,141,051 | 61.0 |
| Rock Island | 1936 | 27,675,851 | 19,763,802 " | 7,912,049 | 71.4 |
| I. C. | 687 | 12,636,936 | 8,312,467 " | 4,324,469 | 65.8 |

### 1963 ASSESSMENT

| | | | | | |
|---|---|---|---|---|---|
| Northwestern | 1952 | 17,013,089 | 16,510,417 (P-34) | 502,672 | 97.0 |
| Burlington | 879 | 26,577,493 | 17,952,953 " | 8,624,540 | 67.5 |
| Milwaukee | 1709 | 31,582,061 | 20,186,196 " | 11,395,865 | 63.9 |
| Rock Island | 1936 | 26,886,823 | 19,171,306 " | 7,715,517 | 71.3 |
| I. C. | 687 | 12,158,019 | 8,146,043 " | 4,011,976 | 67.0 |

(a) No obsolescence allowed by Tax Commission in applying formula.
(b) Formula value computed with same obsolescence allowance as given to other railroads.
(c) Increase.

1370

Section 434.15, Code, 1962, relating to railway assessments, provides: "The said property shall be valued at its actual value, and the assessments shall be made upon the taxable value of the entire railway within the state, * * *, and the taxable value shall be determined by taking sixty percent of the actual value so ascertained and shall include the right of way, roadbed, bridges, culverts, rolling stock, depots, station grounds, shops, buildings, gravel beds, and all other property, real and personal, exclusively used in the operation of such railway. In assessing said railway and its equipments, said state commission shall take into consideration the gross earnings per mile for the year ending January 1, preceding, *and any and all other matters* necessary to enable said state commission to make a just and equitable assessment of said railway property. * * *." (Emphasis supplied.)

Section 441.21, Code, 1962, also provides:

"All property subject to taxation shall be valued at its actual value * * *, and shall be assessed at sixty percent of such actual value. Such assessed value shall be taken and considered as the taxable value of such property upon which the levy shall be made. The actual value in such cases shall be one and two-thirds times the assessed value as shown by the assessment rolls and may be so determined and ascertained.

"In arriving at said actual value the assessor shall take into consideration its productive and earning capacity, if any, past, present, and prospective, its market value, if any, *and all other matters* that affect the actual value of the property; and the burden of proof shall be upon any complainant attacking such valuation as excessive, inadequate or inequitable." (Emphasis supplied.)

It is evident considerable discretion is vested in the taxing authorities in the determination of actual value. In each statute the assessing authority is directed to consider certain things "and all other matters" that affect actual value. It is contemplated the assessing authority make a complete examination and study of each property assessed and apply a just and reasonable judgment factor in arriving at actual value. Such a

determination defies any absolute mathematical formula by which any given assessment may be tested.

We have pointed out several times that valuations for tax purposes are not capable of exact ascertainment and cannot be more than approximately correct. Deere Mfg. Co. v. Zeiner, 247 Iowa 1364, 1377, 78 N.W.2d 527, 79 N.W.2d 403. We have said the taxpayer's burden is not met by showing merely a difference of opinion between his witnesses and the assessing authority, and so, unless it is manifest the valuation is grossly excessive and is a result of the will and not the judgment, the assessment will be sustained. Maxwell v. Shivers, 257 Iowa 575, 133 N.W.2d 709, and citations. Unless the assessment is so out of line with other actual values as to give rise to the inference the authority has not properly discharged its duty, the assessment should not be disturbed. Maxwell v. Shivers and Deere Mfg. Co. v. Zeiner, both supra. We have further pointed out, due to the presumption that assessing authorities have performed their duties, that to set aside the assessment there must be a clear and affirmative showing the variance is an intentional discrimination and one adopted as a practice. Deere Mfg. Co. v. Zeiner, supra; Chicago Great Western R. Co. v. Kendall, 266 U. S. 94, 45 S. Ct. 55, 69 L. Ed. 183, 189.

II. The trial court held there was no excessive valuation of plaintiff's property shown, and no question is raised in this appeal as to the propriety of the commission's action in establishing the actual value of plaintiff's operating railroad in Iowa. The North Western's complaint is that the actual value and the assessed value of its property were arbitrarily and capriciously maintained near its formula value, while the other comparable railroads' actual value was inequitably reduced so far below their formula value as to disclose gross discrimination, and that plaintiff was, as a result, assessed at a higher percentage of its actual value than the property of other similar railroads in the state. In other words, it claims the evidence was clear that the commission's judgment factor, as a practice, had been and was intentionally and improperly invoked causing such discrimination against plaintiff. The trial court so found and we agree.

III. Equality of taxation, of course, requires not

only a uniform rate of tax but uniformity in valuation. Both the State and Federal Constitution so require, in order that the tax burden be not unfairly distributed. Cumberland Coal Co. v. Board of Revision, 284 U. S. 23, 52 S. Ct. 48, 76 L. Ed. 146; Sioux City Bridge Co. v. Dakota County, 260 U. S. 441, 43 S. Ct. 190, 67 L. Ed. 340, 28 A. L. R. 979; Iowa Central Railway Co. v. Board of Review, 176 Iowa 131, 157 N.W. 731; Barz v. Board of Equalization, 133 Iowa 563, 111 N.W. 41. Thus, if, in fixing the actual value of the other four railroads, as a practice the officials systematically undervalued them while valuing plaintiff at full actual value, the discrimination is as illegal and evident as if the rate of assessment applied to each property were not the same. Chicago Great Western R. Co. v. Kendall, supra.

 Substantial evidence supports appellee's claim of discrimination under section 441.37(1), Code, 1962. The first requisite in proof of inequitable assessments of property as compared with other similar properties is that there are such similar properties and, second, that an inequality exists. Mason v. Board of Review, 250 Iowa 291, 293, 93 N.W.2d 732; Daniels v. Board of Review, 243 Iowa 405, 52 N.W.2d 1; Rosenbaum & Sons, Inc. v. Coulson, 246 Iowa 848, 69 N.W.2d 403; Deere Mfg. Co. v. Zeiner, supra.

It is clear the property of the other four major railroads operating in Iowa is substantially similar. This is all the law requires. Deere Mfg. Co. v. Zeiner, supra. From the reports filed with the commission over the years, under the provisions of section 434.1 of the Code, the charts submitted, and the testimony, these railroads have similar roadbeds, bridges, rolling stock, buildings and other relative features. The assessment of each road is set out in the exhibits, and actual values appear or can be computed under authority of section 441.21 of the Code. The 1963 assessments show the commission applied a three percent reduction of the formula value in plaintiff's case, while it applied a 28 to 36 percent reduction to the other four railroads. Like discrepancies and general valuation reduction discriminations were shown for preceding years.

 Obviously, plaintiff's property was treated differently from that of other like railroads to its detriment. This treatment

would have justified a reduction of its assessment under the provisions of Code section 441.37(1), had it been asked by appeal. Maxwell v. Shivers, supra, 257 Iowa 575, 133 N.W.2d 709. However, under the prayer of this petition asking avoidance of the 1963 assessment, proof of arbitrary and capricious commission action is required. We think it was furnished.

▆▆▆▆ Continual and substantial departure from the formula value in fixing actual value in the case of all major railroads operating in Iowa except the North Western, shown as a practice, compels a conclusion that the commission willfully failed to fairly assess plaintiff's property. These wide departures exceeded the discretion lodged in the commission and warranted the trial court's action in setting aside and declaring the 1963 assessment against the North Western void. Since the relief prayed on this ground was properly granted, the commission must forthwith reassess the plaintiff's property so that it will be fair and equitable with the property of the other operating railroads in Iowa.

IV. Next we must consider the contention that the commission acted in an arbitrary and capricious manner in assessing the North Western property at a higher percentage of its actual value than other property subject to taxation in Iowa. The proposition advanced is unique, especially as it applies to the establishment of a yardstick to measure the rate of assessment of property generally in the state.

To sustain its contention plaintiff relies primarily on evidence of sales-assessment studies and ratios which it claims reveals that real estate generally over the state is assessed at less than 27 percent of its actual value. The commission objected to this evidence as irrelevant, incompetent and immaterial, but made no objection on the grounds of hearsay or secondary evidence.

The basic data for the three sales-assessment ratio studies were collected under the direction of the commission pursuant to the requirements of section 421.17(6), Code, 1962, which provides as follows: "* * * The commission shall require all county recorders and city and county assessors to prepare a quarterly report in the manner and form to be prescribed by the commis-

sion showing for each warranty deed or contract of sale of real estate, divided between rural and urban, during the last completed quarter the amount of revenue stamps, sale price or consideration, and the equalized value at which that property was assessed that year. This report with such further information as may be required by the commission shall be submitted to the commission within sixty days after the end of each quarter. The commission shall prepare annual summaries of such records of the ratio of assessments to actual sales prices for all counties, and for cities having city assessors, and such information for the preceding year shall be available for public inspection by May 1." Other subdivisions of this section grant the commission power to "investigate the work and methods of boards of review, * * *, in the assessment, equalization, and taxation of all kinds of property * * *" and authorize the commission to visit localities to check on the work. Apparently for 1962, the first survey year, the commission did no more than to require the above mentioned reports. Over 35,000 sales were reported, and the following summer the commission published the results of its "Real Estate Assessment Ratio Study" covering 28,771 of those sales. (Exhibit P-86) The combined state average ratio of assessed value of those transactions to selling price of both rural and urban properties was 24.21 percent.

Ratio studies arrived at by Dr. Rolf Weil and Dr. Frederick Ekeblad from that data were substantially the same.

Later, "Memorandum #138", dated July 23, 1963, was composed and sent to all city and county assessors. It provided in part:

"The commission expects all assessors in this state in their valuing, listing, and assessing all classes of real property in the year 1965, as of January 1st of that year, to see to it that the assessed values of all taxable real property are not less than twenty-seven (27) percent of the current fair market value of such property, and the commission likewise expects all local boards of review in their review of such valuations and assessments to consider this Memorandum. The provisions of Section 441.21, Code of Iowa, 1962, are to be complied with in arriving

at 'actual value' and determining the taxable value of the property."

The trial court concluded the evidence sustained plaintiff's contention that the property of the North Western was assessed at 60 percent of its actual value and property generally in Iowa was assessed at less than 30 percent of its actual value, thus approving this method of equalizing assessments on real property in Iowa.

As previously pointed out, whether the assessors have been undervaluing property generally 50 percent or have been assessing at 30 percent of actual value rather than 60 percent called for by statute, constitutional requirements can only be met if all property is given substantially like treatment in fixing assessed valuation. Chicago Great Western R. Co. v. Kendall, supra, and citations. Therefore, if plaintiff has shown by clear and affirmative evidence that its property is and has been assessed at 60 percent of its actual value, while other property in Iowa is regularly assessed at 25 or 30 percent of its actual value, gross discrimination does exist, which would entitle the North Western to the prayed relief. Chicago Great Western R. Co. v. Kendall, supra.

It seems to be conceded that plaintiff was assessed at about 60 percent of its actual value, and it must be presumed the local assessor performed his duty and assessed other property generally at 60 percent of its actual value. It was plaintiff's burden to prove otherwise. The vital questions then raised in this issue are, (1) was there a sufficient showing that other property in Iowa was assessed at less than 30 percent of its market value, and (2) did the commission and the local assessors fail to give adequate consideration of market value in determining the actual value of other property in Iowa subject to assessment? Both are very close questions.

V. Appellants contend evidence of a sales-assessment ratio is incompetent, irrelevant and immaterial to establish an actual value-assessed value ratio. They say we have so held in Rosenbaum & Sons v. Coulson, supra, 246 Iowa 848, 69 N.W.2d 403. However, since market value is one of the elements the assessing authority is directed to consider in fixing actual value,

we are satisfied a sales-assessment study based upon properly collected sales-assessment surveys has probative value and is admissible. In re Chicago, Burlington & Quincy Railroad Co., 170 Neb. 77, 101 N.W.2d 856, and citations; People ex rel. Wenzel v. Chicago and North Western Railway Co., 28 Ill.2d 205, 190 N.E.2d 780, and citations. It is true we have refused to consider such studies in the Rosenbaum case and in Daniels v. Board of Review, 243 Iowa 405, 52 N.W.2d 1, and in Mason v. Board of Review, 250 Iowa 291, 93 N.W.2d 732, but it seems those ratios were insufficiently established to have the weight required to sustain a claim of inequitable assessment.

Is the sales-assessment survey made by the commission in one year (1962) sufficiently thorough, authenticated and comprehensive to conclusively establish a sales-assessment ratio of property assessed by local assessors in Iowa? Does it tend to establish the fair market value of such property? The appellant contends it does not, and its witnesses including Dr. William G. Murray testified the survey only tended to prove the ratio of assessment of the properties reported was less than 30 percent of market value established by those sales, that it was not conclusive of all locally assessed property.

Although, as stated by the Nebraska Supreme Court in Carpenter v. State Board of Equalization and Assessment, 178 Neb. 611, 134 N.W.2d 272, 278, evidence of a bare survey does not furnish a very reliable yardstick or criterion by which equalization of taxation should be required, the survey here made by the commission was made pursuant to legislative direction and is entitled to consideration. On the other hand, it was for only one year (four would have been better), was compiled solely from the assessors' reports, and its correctness was not checked by the commission. As we see it, the sales-assessment ratio, accurate as it may be for the properties involved, was little more than the application of a statistical method to a mass of raw, unchecked and uncertain information, acquired as an aid to the commission in its endeavor to get local authorities to give more weight and consideration to market value in fixing actual value of property in their respective districts. To make such surveys and studies conclusive, it would seem desirable, if not

necessary, for the commission to cross-check and investigate the reported sales to see that they are comprehensive, that they include all types of realty, old houses and new, deteriorated areas as well as new additions. This was not done. In the cases cited from other states it appeared such cross-checking was done, so that sales were bona fide and did not reflect a basis other than present value of the premises. Furthermore, as pointed out by appellants, other elements besides present value may be considered in a sale which would either depress or enhance its sale price. Some property is not for sale, and some cannot be sold. Market price might be temporarily influenced by elements other than inherent worth. Area depression, farm enlargement needs and city annexations are common factors which radically influence sales price and are not reflected in such a survey.

We conclude, while evidence of market value of property locally assessed was admissible in this action, its probative value is greatly reduced by the limited scope of the survey, and when the general nature of the survey and the failure of the commission to expand and check the bare reports is considered, it cannot be said either as a matter of fact or of law that the sales-assessment ratio was conclusive of the assessment rate of property generally in the state.

VI. In order to sustain its finding that the commission had arbitrarily and capriciously determined that actual value of property generally for tax purposes should be approximately one half the current fair market value, the trial court had to equate actual value as used in our taxing statutes to property sale transactions. It did so by defining "actual value" as the "fair cash equivalent of the property." This cannot be approved, for it clearly goes beyond the statutes and is contra to all of our previous decisions. It tends to eliminate entirely the judgment factor reposed in taxing authorities by the legislature.

As we pointed out in Division I hereof, actual value as used in taxing statutes cannot be determined with mathematical certainty. It is a relative value properly determined by the assessing authority after a personal inspection or investigation of each property, and purports to spread the burden of ad valorem taxation on a uniform and equal basis. Al-

though there was testimony that the judgment factor may differ among assessors as much as 15 or 20 percent, what this value lacks in uniform market or sales valuation reflections it gains by an honest consideration of the individual characteristics of property by a trained and able assessing authority. It has been well established in Iowa that actual value, market value, and sales value are not synonymous terms. In re Appeal of Bankers Life Co. v. Zirbel, 239 Iowa 275, 31 N.W.2d 368; ·Des Moines Bldg.-L. & Sav. Assn. v. Bomer, 240 Iowa 1192, 36 N.W.2d 366; Mason v. Board of Review, supra, 250 Iowa 291, 93 N.W.2d 732. The elements to establish each may be the same, but are not necessarily so. As previously pointed out, other elements besides present value may be considered in a sale value which would either depress or enhance its actual value.

True, we said in Hawkeye Portland Cement Co. v. Board of Review, 205 Iowa 161, 166, 217 N.W. 837, 840, if a property has a market value, then ordinarily there can be no distinction between market value and actual value. In a later case, In re Appeal of Bankers Life Co. v. Zirbel, supra, at page 281 of 239 Iowa, page 372 of 31 N.W.2d, we pointed out that the statute says market value, *if any, shall be considered* as well as other matters affecting its value, and that we could not say market value and actual value are "one and the same" or that market value is the sole test. In our latest case of Mason v. Board of Review, supra, at page 296 of 250 Iowa, page 734 of 93 N.W.2d, we also pointed out that while market or sales value might under certain situations be the same, they were not so considered there.

In Des Moines Bldg.-L. & Sav. Assn. v. Bomer, supra, at page 1197 of 240 Iowa, 369 of 36 N.W.2d, we said: "Despite the fact that market value is, under the statute, one of the factors to be considered in determining actual value, yet we do not feel that this is the sole and controlling factor to be considered." We concluded: "* * * generally in the matter of all valuations for tax purposes the taxing authorities are not alone restricted to a consideration of the sale price despite the fact that the· property may have been sold at approximately the same time as the assessment valuation was made." It was pointed out many factors enter into the sale of a property and that often the value

arrived at by a ready seller and a ready buyer did not reflect actual value.

It is quite clear to us the present statute broadens the elements that may be considered by the assessor in arriving at a fair and stable value of one's property. It places no limitation on the elements that may be considered and does not provide the weight each element should receive in arriving at actual value. The judgment factor of one experienced in such matters, naturally conservative and resistant to sudden and fluctuating changes in the market, is not an undesirable feature. The system has worked reasonably well in Iowa, and only the desire for greater valuations for tax revenue purposes and for fairly allotting State aid has caused equalization surveys.

Approximation both as to value and uniformity in tax matters is all that can be accomplished under our statutes and is all that is required by the Federal and State Constitution. To be avoided are abuses of discretion and judgments *designed* to *avoid* uniformity of valuations and assessments.

It might be well at this point to note the Iowa law formerly provided: "Actual value of property * * * shall mean its value in the market in the ordinary course of trade." Code of 1897, section 1305. Thus, it must have been the legislative desire to consider other elements and a judgment factor as a better and more fair method of establishing actual value for tax purposes. He who claims intentional discrimination of those authorities carries a heavy burden. Maxwell v. Shivers, supra, 257 Iowa 575, 133 N.W.2d 709.

VII. The trial court expressed its dislike of the judgment factor in assessments, principally because it defies measurement. The judgment factor used must, of course, be exercised within certain guidelines laid down by the Code—sections 434.15 and 441.21 in this case. One of the most difficult questions before us, then, is whether the evidence of sales-assessment surveys and studies is sufficient to raise an inference that the taxing authorities have abused their discretion and have willfully failed to fairly consider the elements required and give to them necessary weight in determining the actual value of property generally.

VIII. It was the North Western's burden not only to

show the reliability of the sales-assessment study to show the market value of real property generally, but to show also that value was not properly considered or given the weight required in fixing actual value of property generally.

 There is no evidence assessing authorities did not consider market value of property assessed if it had market value, or that they failed to consider productive and earning capacity of the property, rural and urban. There is no direct evidence they gave undue weight to other matters that affect the actual value. No assessors were called as witnesses. Unless we accept appellee's argument that market value, as established by the survey, must be accepted as actual value, or that the wide variations in these values compel an inference of statutory violation, it has failed to prove a willful practice of not giving market value due consideration in fixing actual value. We think it has failed to establish this contention by clear and affirmative evidence. The claimed inference, if it is an inference, of willful discrimination will not justify a finding here that property generally in Iowa is assessed at less than 30 percent of its actual value, nor that in fixing such actual value, discrimination against the North Western was shown.

Some states, such as Illinois, Pennsylvania and Wisconsin, provided that the actual rate of assessment and percentage of valuation of property used by the authorities can be determined by the sales-assessment ratio, but, due to the difference in statutes providing for determination of actual value, they are not persuasive here. In Bankers Life Co. v. Zirbel, supra, at page 283 of 239 Iowa, page 372 of 31 N.W.2d, we considered the applicability of the law in other jurisdictions equating assessed value to market value, and said: "The Wisconsin court properly held the statute required assessment at market value. We do not think our statute so requires, though as we have already said, evidence affecting market value is to be considered in fixing actual value."

In People ex rel. Wenzel v. Chicago and North Western Ry. Co., 28 Ill.2d 205, 190 N.E.2d 780, the Illinois court upheld the use of assessment-sales ratio studies in finding discrimination against the railroad. Section 501(1), chapter 120, Smith-Hurd

Illinois Annotated Statutes, provides that "Each tract or lot of real property shall be valued at its fair cash value, estimated at the price it would bring at a fair, voluntary sale." The evidence produced showed survey reports, fieldmen checked and sampled real-estate transactions, and verification of the ratios determined throughout the state. Both the statutory requirement and the evidence are different from those in the case at bar.

IX. When all proper elements are considered, it is, we think, impossible to say plaintiff has sustained its burden to show the commission's action in refusing to assess the North Western at the ratio shown by a sales-assessment survey of other property in Iowa was arbitrary and capricious. Thus, the apparent requirement of the trial court that the North Western be not assessed at more than 30 percent of its actual value is disapproved, and to that extent the judgment is modified. However, since there was willful discrimination in the assessment of plaintiff's property and other comparable railroads, the 1963 assessment is void, and the commission must forthwith reassess the North Western's property for 1963 as provided by law, and especially it must reassess plaintiff's property so that it will be fair and equitable with other property in Iowa.

The costs are to be assessed against the tax commission only. —Modified and affirmed.

GARFIELD, C. J., and THORNTON, SNELL, MOORE and STUART, JJ., concur.